ANGELO MELILLO, complainant,

*v.*

JOHN DEVINCENZO et al., defendants.

[Decided January 29th, 1935.]

Mr. *Alan Bruce Conlin,* for the complainant.

Messrs. *Pitney, Hardin & Skinner,* for the Mutual Benefit Life Insurance.

Mr. *Mario Turtur,* for John DeVincenzo et al.

BACKES, V. C.

The bill is to foreclose a mortgage given by Frank Vitagliano to the complainant Melillo, conveying fifty feet on the southerly side of Central avenue, Westfield. Vitagliano owned the adjoining fifty feet on the easterly side and on May 19th, 1930, mortgaged it and the easterly eight feet of the lot covered by the Melillo mortgage to the Mutual Benefit Life Insurance Company. Vitagliano had recently erected a building on the easterly fifty feet to which the eight-foot strip became appurtenant to meet the requirements of local zoning or building regulations, and a release of the strip from the lien of the Melillo mortgage was necessary to clear the title for the mortgage of the Mutual Benefit Life Insurance Company. The company produced a formally acknowledged and recorded release of the eight-foot strip, purporting to have been made by Melillo to Vitagliano May

19th, 1930, upon which it relied in making the mortgage loan. The release is signed by a mark. Melillo, an illiterate, denies he made the mark or that he acknowledged it as his signature to the notary, as she certified. The genuineness of the release is the single issue.

According to Vitagliano, a private banker and steamship agent and of some prominence among his less favored countrymen, Melillo agreed to release the strip, but later refused, demanding $1,500; after many interviews and counterproposals Melillo came to his office on the morning of May 19th about eight-thirty and stated he was willing to take his offer of $1,000, whereupon the two went to the notary, Miss Tantum, employed in a local newspaper office some ten minutes away, who had frequently taken acknowledgments for Vitagliano. Vitagliano introduced Melillo to the notary and stated their mission; the notary said she did not know Melillo, but would take Vitagliano's word for his identity. Melillo produced the form of release, given to him by Vitagliano at the outset, made his mark, the notary took the acknowledgment, certified and gave it back to Melillo who put it in his pocket. When they returned to Vitagliano's office, Melillo took the paper out of his pocket and unctuously addressed Vitagliano (Vitagliano indicated with a flourish), "Mr. Vitagliano, this is a paper I just had to sign it for the eight feet. Where is the $1,000?" Vitagliano replied he was sorry he did not have it ready, but would have it in a few days, to which Melillo suggested, "if you haven't got it, you can give me a check and put in a date when I should get enough money in the bank; give me a check. * * * Can you give me a check in three days after?" Vitagliano gave him a check post-dated May 22d, for $1,000, and Melillo gave him the release and went his way. That is Vitagliano's story.

(Vitagliano's canceled check for $1,000, to the order of Melillo, dated May 22d, 1930, was produced.)

One Sam Rocco says he was present when the two returned from the notary; he was there by appointment with Vitagliano to do some work. He relates that "Mr. Melillo pulled some paper out of his pocket and handed it to Mr. Vitagliano

[and he, too, indicated the flourish] saying, 'that is your paper I signed this morning * * * for the eight feet of ground.' " Melillo wanted his money; Vitagliano replied he didn't have enough to pay him, that if he would give him two or three days to raise it he would give it to him; Melillo persisted and Vitagliano retorted, "all right, I can give you a check for two or three days late and you can hold the check." Melillo agreed and Vitagliano gave him the check. That is Rocco's story.

Melillo not only denies making the mark and appearing before the notary, but when brought face to face with her in court, says he never knew her nor ever had met her until taken to her for identification by his lawyer, accompanied by Vitagliano and his lawyer after the dispute over the release arose. The notary could not identify Melillo as the man who made the mark and says she took the acknowledgment because the maker of the mark was vouched for by Vitagliano.

Ordinarily the denials of the unlettered Melillo would go down before the legal force of the notary's certificate and the testimony of Vitagliano reinforced by Rocco. Then, too, Melillo denied the mark on the release, when shown to him at the hearing, before looking at it, and it might be argued that his disposition was to deny everything. The explanation is that he had seen the release and knew what the paper was. He also denied his mark in endorsing the check when cashing it at the bank, and this would give further grounds for argument of a predisposition to repudiate everything. When it was called to his attention he explained that he did not think, and it is quite likely he did not understand.

The truth is: Melillo had retained Augustus C. Nash, an attorney in Westfield, to collect the mortgage debt. Mr. Nash wrote to Vitagliano under date of May 19th that his client insisted upon payment, and he produced a manifold copy of the letter. In response to the letter Vitagliano called May 23d, and gave him the check as a payment on account of the mortgage and promised to pay the balance within three months. Mr. Nash so testified and produced a manifold copy of a receipt he gave Vitagliano, which reads:

"May 23rd, 1930.

Mr. Frank Vitagliano,
   Central Avenue,
   Westfield, N. J.
Dear Sir:—

   This is to acknowledge receipt of your check bearing date of May 22nd, 1930, payable to the order of Angelo Melillo in the sum of One thousand ($1,000) Dollars. The same to be credited on account of the principal of a mortgage made by yourself and wife to Mr. Melillo and which mortgage bears date of October 29th, 1928, and is recorded in the Union County Register's office in Book 949 of mortgages at pages 485, etc. The mortgage being given originally in the sum of Fifty-five hundred ($5,500) Dollars.

   The check delivered today in the sum of One Thousand ($1,000) Dollars will leave the principal sum of the mortgage at Forty-five hundred ($4,500) Dollars. It is understood that you will make arrangements to pay off the balance of the principal of the mortgage within three months from the date hereof.

Very truly yours,

ACN/MS."

Mr. Nash's stenographer, Miss Simonetto, wrote the letter and receipt upon his dictation and was present when Vitagliano gave her employer the check and she so testified and corroborated Mr. Nash in all the facts. Vitagliano denies he received the letter and the receipt, and he denies receiving a letter of August 28th, dictated by Mr. Nash, a copy of which the stenographer testifies typing and mailing (a copy was produced), calling his attention to the promise he had made to pay the balance due on the mortgage. Mr. Nash and his stenographer are disinterested, reputable and reliable.

It is definitely established that Vitagliano did not give the check to Melillo for the release; his statement that he did is a pure fabrication and carries destruction to his otherwise plausible story of Melillo haggling with him over the price of the release, the compromise, going to the notary to execute the release and giving a post-dated check in payment, and to the false tale of the convenient Rocco, present quite by chance at the crucial moment, and after a lapse of four years remembered the decisive details of an affair in which he had not the slightest concern, who saw Melillo hand over the release with the flourish described by Vitagliano and receive the check.

The defendants obtained a rehearing. They produced witnesses to discredit Melillo, Mr. Nash and his stenographer.

One Panzanella testified that on the night of the day of the hearing (September 10th, 1934) between seven-thirty and eight o'clock he was standing with his friend, DiFonzo, at a street corner in Westfield as Melillo approached and greeted him, and being asked how he had made out with his case, Melillo replied that the case was over and he had won; asked how he won, Melillo answered, "well, I won the case, but it cost me plenty money just to make a letter which Frank Vitagliano never received. * * * The letter shows the $1,000 that was paid was paid on the mortgage instead of the money for the driveway;" that Vitagliano's lawyer tried to force him to say he signed the papers, but "I didn't admit that; I held with my word from the beginning to the end, that I didn't sign any papers. * * * I just put one over on Frank Vitagliano; that's the only way I can fool him, by sticking to my word." The witness: "You know that is bad. It's a shame to go to court and lie to win a case from another fellow." Melillo: "I don't care, it's the only way I can get my money from the mortgage he owed me. * * * I don't care. I won the case and they can't do anything to me any more." Melillo was a friend; the conversation lasted five minutes; nothing else was discussed.

DiFonzo tells of being with Panzanella and that Panzanella asked Melillo how he made out with the case, to which he replied, "I won the case. * * * Only God knows how I win the case. * * * That letter that Mr. Vitagliano never received, only God knows how much it cost me." Panzanella broke out, "gee, that's a shame, those things to happen like that." To which Melillo responded, "they want to try me to say yes, but I insist to say no. I cross the paper, but I insist to say no; and the lawyer try me, but I deny and say no." Panzanella again said, "gee, that's a shame," and Melillo answered, "well, what do I care as long as I win the case? * * * It's a shame, but that's the only way I can get my money. * * * I won and nobody now can do nothing to me anymore. * * * What do I care? * * * I won

the case. It don't make any difference much." The witness knew Melillo by sight.

William Porchetta testified that on September 16th, 1934, a Sunday, about three-thirty in the afternoon, in front of his place, he was talking to one Caldaro when Melillo came along and he asked him how he came out with his case. Melillo answered, "huh, I won my case very easily. * * * I would have been a fool to say I signed my cross on the paper when I could put one over on Vitagliano." The witness' reaction to this was, "then you lied. You would get in trouble if that was found out." To which Melillo replied, "No, I can't get in trouble, my case is over." The witness then addressed Caldaro, "did you hear how he won his case?" Caldero replied, "come on, let's go, I don't care about the case." The witness said he had known Melillo for ten years.

Caldero testified that he had an appointment with Porchetta for three-thirty on the Sunday of September 16th, 1934, to go to a movie, and while on the sidewalk in front of Porchetta's place, Melillo came along and Porchetta asked him, "how did you make out with your case with Vitagliano, the Vitagliano case?" He replied, "I won the case very easily." Upon being asked by Porchetta how he won it so easy, he said, "well, I would have been a fool to admit signing the papers." That Porchetta warned him to "watch out, don't say too much about it, don't talk about it, or you'll get yourself in trouble." Melillo: "Well, they can't do nothing to me now, I won the case." Caldero did not know Melillo before this meeting.

Melillo denies both meetings. He says that on the night of the day of the hearing he left his home about seven o'clock and went to the shop of Tony Dagostare close by, far distant from the Panzanella-DiFonzo meeting place, and remained there till ten-thirty playing cards. He did not know DiFonzo or Caldero and knew Porchetta by sight only.

George Chrone, a messenger for Conlin, Melillo's lawyer, says that on the evening of the day of the trial, Conlin asked him to go to Westfield to see Melillo to get some money, he wanted another fee of $50; that he went to Dagostare's shop, where, he knew, Melillo usually went; Dagostare was in the

doorway and while standing there Jack Lanza came and a few minutes later he saw Melillo coming down the street; it was about seven o'clock; Peter Caruso joined them, and as he left Melillo, the rest went into the shop.

Tony Dagostare testified that on the night of September 10th, George Chrone came to his shop asking for Melillo and while standing outside with Jack Lanza and a Mr. Caruso he saw Melillo come up the street from his home; it was about seven o'clock; that Chrone, addressing Melillo, said, "Mr. Melillo, I just come up to see you, because the lawyer wanted a little money." That after Chrone left they went inside and played cards, he, Lanza, Melillo and Caruso; they played until about ten-thirty, when all left.

Lanza and Caruso gave supporting testimony that they were with Melillo in Dagostare's shop from seven o'clock until ten-thirty playing cards.

The case had not been decided; Melillo had not won; counsel had not argued the cause. The plot is overdone; it is inherently false in its sinister implication that Mr. Nash, a lawyer of high repute, conspired with Melillo and forged the letters and the receipt for profit (his fee was $10), and revolting in its aspersion that he and his former secretary foully perjured themselves. And had Melillo won, is it conceivable that he would have flaunted his depravity—that he won by flagrant perjury—upon casual meetings and before strangers (DiFonzo and Caldaro were strangers), to be spread through the Italian community in which Vitagliano lived, to his undoing and the loss of the victory of which he boasted? Vitagliano's second draft upon his compatriots to help in a pinch is in keeping with the earlier planting of the accommodating Rocco, who saw the release given in exchange for the check? The release is a forgery and the certification of acknowledgment by the notary was procured by impersonation. The probative value of the certificate of acknowledgment, urged by the defendants and buttressed by the cases cited (*Hyer* v. *Little, 20 N. J. Eq. 443; Tooker* v. *Sloan, 30 N. J. Eq. 394; Homeopathic Mutual Life Insurance Co.* v. *Marshall, 32 N. J. Eq. 103; Black* v. *Purnell, 50 N. J. Eq. 365; 24 Atl. Rep. 548; Gould* v. *Murley, 75 N. J. Eq. 512;*

73 *Atl. Rep. 129; Colonial Building and Loan Association* v. *Griffin, 85 N. J. Eq. 455; 96 Atl. Rep. 901; Brady* v. *McHugh, 94 N. J. Eq. 336; 119 Atl. Rep. 377; Potter* v. *Steer, 95 N. J. Eq. 102; 122 Atl. Rep. 685; Walkowitz* v. *Walkowitz, 95 N. J. Eq. 249; 122 Atl. Rep. 835; Greenberg* v. *Dessen, 99 N. J. Eq. 666; 134 Atl. Rep. 181; Mitschele-Baer, Inc.,* v. *Livingston Sand and Gravel Sales Co., 108 N. J. Eq. 286; 154 Atl. Rep. 752; Young* v. *Duvall, 109 U. S. 573; 27 L. Ed. 1036,* and *Northwestern Mutual Life Insurance Co.* v. *Nelson, 103 U. S. 544; 26 L. Ed. 436*), is overcome and destroyed.

The complainant is entitled to a decree and sale of the mortgaged premises free of the release.